UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------------------------------ x
UNITED STATES OF AMERICA,                                    :
                                                             :
                                    Plaintiff,               :    OMNIBUS RULING
                                                             :
              -against-                                      :    3:24-CR-213 (VDO)
                                                             :
BENNIE GRAY,                                                 :
                                                             :
                                    Defendant.               :
------------------------------------------------------------ x
```

**VERNON D. OLIVER**, United States District Judge:

Defendant Bennie Gray, proceeding *pro se* with the assistance of standby counsel, was indicted on one count of possession with intent to distribute fentanyl and cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).[1] This matter is before the Court on three motions filed by Gray, including: (1) a motion to dismiss indictment for violation of the Speedy Trial Act,[2] (2) a motion to suppress any evidence seized from his person and from the trunk of the car he was driving on September 5, 2024,[3] and (3) a motion to supplement the record on the motion to suppress.[4] For the following reasons, the motion to dismiss is **denied**, the motion to suppress is **granted**, and the motion to supplement the record is **denied as moot**.

---

[1] ECF No. 1 at 1 ¶ 1.

[2] ECF No. 152.

[3] ECF No. 46.

[4] ECF No. 111.

I.  **MOTION TO DISMISS**

    A.  **Discussion**

Gray moves to dismiss the indictment on the ground that more than seventy days had elapsed after his initial appearance without trial commencing and thus, there is a violation of the Speedy Trial Act ("STA").[5]

Under the STA, "when a trial is not commenced within the prescribed period of time, the information or indictment *shall be dismissed* on motion of the defendant." *United States v. Pikus*, 39 F.4th 39, 52 (2d Cir. 2022) (cleaned up). The STA mandates when a court must commence trial once a defendant pleads not guilty:

> [T]he trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1). "To determine when the STA clock begins, the day after the triggering event is the first to be counted for purposes of the statute." *United States v. Lynch*, 726 F.3d 346, 352 (2d Cir. 2013) (cleaned up). The seventy-day clock is triggered by the later of two events, either (1) the filing of the information or indictment, or (2) the defendant's first appearance in the court where the indictment was filed. 18 U.S.C. § 3161(c)(1). The STA also provides "necessary flexibility" by including provisions for excluding periods of delay from the seventy-day clock. *Zedner v. United States*, 547 U.S. 489, 497 (2006). While some sources of delay are automatically excluded, such as the "delay resulting from any pretrial motion," 18 U.S.C. § 3161(h)(1)(D), courts have the discretion to exclude delay "if the court, after

---

[5] ECF No. 152 at 1.

considering certain factors, makes on-the-record findings that the ends of justice served by granting the continuance outweigh the public's and defendant's interests in a speedy trial." *Zedner*, 547 U.S. at 498; *see also* 18 U.S.C. § 3161(h)(7)(A) (governing ends of justice continuances). Specifically, "a district court must provide the specific reasons for why granting the continuance would serve the ends of justice based upon its analysis of the factors set forth in 18 U.S.C. § 3161(h)(7)(B)." *Lynch*, 726 F.3d at 354.

Here, because Gray's arraignment occurred later than the filing of the indictment, the date of that appearance is the starting point of the seventy-day clock. Gray was arraigned on December 3, 2024,[6] and thus, the starting date for the clock is December 4, 2024. *United States v. Gaskin*, No. 22-CV-98 (SRU), 2024 WL 343026, at *4 (D. Conn. Jan. 30, 2024) (cleaned up) ("The date of the indictment or arraignment is not counted; the first day is the day *after* the indictment or the arraignment."). If the clock ran its course without the court excluding any periods of delay, then Gray's trial would need to have commenced by February 11, 2025.

But the STA provides that certain periods of delay shall be excluded from the seventy-day clock and those "exclusions have the effect of extending the date by which trial must commence." *Id.* at *3. As discussed below, less than seventy days have elapsed due to excluded time.

---

[6] ECF No. 13.

First, beginning on January 8, 2025, Gray filed multiple motions to remove his assigned counsel,[7] which the Court resolved on February 3, 2025.[8] The period between **January 8, 2025** and **February 3, 2025** is therefore excluded under 18 U.S.C. §§ 3161(h)(1)(D), (h)(1)(H).

Second, the period between **January 29, 2025** and **April 7, 2025** is excluded under 18 U.S.C. § 3161(h)(7)(A). The Court previously accepted defense counsel's representation that a continuation of the trial schedule was required to allow the parties to pursue a resolution of this matter outside of trial and then concluded that the ends of justice were best served by continuing jury selection and excluding this time.[9]

Third, the period between **March 31, 2025** and **April 29, 2025** is excluded under 18 U.S.C. §§ 3161(h)(1)(D), (h)(1)(H). Beginning on March 31, 2025 Gray filed a number of pretrial motions seeking court orders (1) affording him pretrial release from custody, (2) requiring the United States to produce a bill of particulars, and (3) allowing him the use of a laptop for discovery purposes at a federal detention facility.[10] The Court resolved the motions on April 29, 2025.[11]

Fourth, on September 23, 2025, the Court held that the period of time between **March 14, 2025** and **April 21, 2026** was excluded under 18 U.S.C. §§ 3161(h)(7)(A). The Court concluded that "the ends of justice served by continuing the jury selection date outweigh the best interests of the public and Defendant in a speedy trial, and the failure to grant a

---

[7] ECF Nos. 23, 24, 25, 33.

[8] ECF No. 37.

[9] ECF No. 89.

[10] ECF Nos. 59, 60, 70, 74.

[11] ECF No. 91.

continuance would deny Defendant the reasonable time necessary for effective preparation, taking into account the exercise of due diligence."[12] Indeed, this decision considered Gray's objection to going forward with trial in October 2025 and his representations of unresolved discovery issues.[13] Finding that discovery remained outstanding and there was a recent production of discovery to Gray, the Court also noted that Gray's motion to suppress evidence, filed on March 14, 2025, remained pending.[14] The Court held a hearing on March 8, 2025 and, at the end of the hearing, ordered supplemental briefing to be completed by July 14, 2025.[15] The Court again noted that the pending motion to suppress evidence required an automatic exclusion of delay.[16]

Examining the above dates in the record makes clear that, with excluded time set aside under the STA, only the period of **December 4, 2024 to January 7, 2025** have counted towards the seventy-day clock. Thus, because only **34 non-excluded days** have lapsed before the date of Gray's jury selection, Gray's statutory rights under the STA have not been violated.

Moreover, as of the filing of this opinion, the STA clock continues to be tolled. The Court reiterates that the STA "mandates the automatic exclusion—without limitation—of 'delay resulting from *any* pretrial motion.'" *United States v. Shellef*, 718 F.3d 94, 109 (2d Cir. 2013) (quoting 18 U.S.C. § 3161(h)(1)(D)), and "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually

---

[12] ECF No. 151.

[13] ECF No. 147.

[14] ECF No. 46.

[15] ECF Nos. 103, 104.

[16] *Id.*

under advisement by the court." 18 U.S.C. § 3161(h)(1)(H). As such, Gray's filings of the following motions have resulted in the automatic exclusion of time under the STA: (1) motion in *limine* filed on April 11, 2025,[17] (2) motion to add one additional exhibit to the hearing on the motion to suppress filed on June 2, 2025,[18] (3) motion to dismiss indictment filed on November 28, 2025,[19] (4) motion *in limine* to exclude expert testimony filed on December 16, 2025,[20] and (5) motion to dismiss indictment filed on January 21, 2026.[21]

### B.   Conclusion

For the foregoing reasons, Defendant's motion to dismiss the indictment for violation of the STA is **denied**.

## II.   MOTION TO SUPPRESS EVIDENCE

### A.   Factual Background

The pertinent facts are largely undisputed, as the record includes video footage from the dash camera and the body cameras of the officers involved in the September 2024 traffic stop. Moreover, Investigator Nathan O'Keefe, Detective Matt Goddu, and Detective Christopher Nott testified at the evidentiary hearing held on May 8, 2025.[22]

On September 5, 2024, members of the Connecticut State Police Violent Crimes Task Force and Norwich Police Department including Investigator O'Keefe, conducted surveillance

---

[17] ECF No. 79.

[18] ECF No. 111.

[19] ECF No. 152.

[20] ECF No. 154.

[21] ECF No. 157.

[22] ECF No. 106.

outside a residence in Norwich, Connecticut.[23] Law enforcement had received multiple complaints about alleged drug trafficking from the residence in the months of August and September 2024.[24] Investigator O'Keefe observed a white vehicle arrive and park in front of the residence.[25] Investigator O'Keefe then observed Gray walking into the residence with a black fanny pack around his chest and, thereafter, a second male who was known to law enforcement based on a prior investigation entered the residence.[26] Approximately two minutes later, Investigator O'Keefe observed Gray leaving the residence, entering the Nissan, and driving away.[27]

After the Nissan departed the residence, another law enforcement officer who was positioned down the street, Detective Nott, was told that that the vehicle did not use a turn signal when it left the curb in front of the residence.[28] Then, after Detective Nott observed the Nissan drive by him, he pulled out behind the Nissan, followed it, and observed the vehicle make a turn without using a signal.[29] Detective Nott subsequently determined that he would stop the vehicle.[30]

After stopping the Nissan, as Detective Nott approached the vehicle, he observed the passenger side door open and observed the female front passenger, Heather Poplasky, reaching

---

[23] Tr., ECF No. 107 at 25.

[24] *See generally* Def. Ex. B, ECF No. 46-3.

[25] Tr., ECF No. 107 at 27:3–14.

[26] *Id.* at 27:8–28:5.

[27] *Id.* at 32–33.

[28] *Id.* at 135:10–19.

[29] *Id.* at 135–136.

[30] *Id.* at 136:19–21.

into the center console and under the seat, and possibly throwing something out of the car.[31] Detective Nott then communicated to Investigator O'Keefe to back him up at the traffic stop.[32] Detective Nott instructed Poplasky to shut the door and for her and Gray to place their hands on the dashboard, which they did.[33] Poplasky apologized and informed Detective Nott that she did not have pants on.[34] Detective Nott then indicated to the passengers that he did not know what Poplasky threw outside the car.[35] Then, after Gray identified himself, Detective Nott informed Gray that he was pulled over for repeatedly not using a turn signal while driving and because the car registration came back to someone who had an outstanding warrant.[36] Poplasky then identified herself in response to questioning from Detective Nott.[37]

Upon the arrival of additional officers about two minutes later,[38] Gray and Poplasky were ordered to exit the vehicle for officer safety purposes, which they did.[39] The officers then began searching the grass next to the passenger door.[40]

Law enforcement spoke to both Gray and Poplasky after they were separated. During the period from when Poplasky exited the vehicle until confirmation regarding the absence of

---

[31] *Id.* at 138:17–22, 145:1–9.

[32] *Id.* at 139:12–17.

[33] Def. Ex. C at 00:52.

[34] *Id.* at 00:53–01:01.

[35] *Id.* at 01:05–01:07.

[36] *Id.* at 01:11–01:38.

[37] *Id.* at 01:48–01:55.

[38] *Id.* at 03:53.

[39] *Id.* at 04:32–05:05 (Poplasky exiting car), 05:50–05:57 (Gray exiting the car and following Detective Nott's instructions to place his hands in the front of the car).

[40] *Id.* at 06:25–06:35.

warrants for Poplasky was received, she was combative at some points and incoherent at others.[41] When Investigator O'Keefe arrived at the scene, Poplasky had already exited the vehicle and was being questioned by officers.[42] Approximately twelve minutes after Investigator O'Keefe's arrival, the officers received confirmation that Poplasky was on probation or parole, that she had no outstanding warrants, and that she was the protected party in a protective order.[43]

Gray was calm and provided clear information to law enforcement.[44] Detective Nott asked Gray to take his license out of his wallet and to hand it to him, which he did,[45] and then approximately three minutes later, Detective Nott received confirmation that Gray had no warrants and that his license was valid.[46] Gray confirmed that he was not the owner of the vehicle, but that he was in the process of purchasing the car.[47] Detective Nott then asked Gray for the identity of his Probation Officer.[48] Immediately after this exchange, another officer went to the vehicle to look for Poplasky's pants and asked Gray for permission to open the car and to retrieve the pants from the car, which Gray gave, but withheld consent for a search.[49]

---

[41] ECF No. 116 at 5 (citing Def. Ex. F).

[42] Def. Ex. F at 00:47.

[43] ECF No. 107 at 41–42; ECF No. 116 at 4 ("Officers also received confirmation that Poplasky had no outstanding warrants (citing Def. Ex. F at 13:16).

[44] ECF No. 116 at 5.

[45] Def. Ex. C. at 06:50–06:58.

[46] ECF No. 116 at 4 (citing Def. Ex. C at 09:52); ECF No. 107 at 148–149 (Nott explaining that dispatcher said that Gray doesn't have any warrants).

[47] Def. Ex. C at 09:29–09:33.

[48] *Id.* at 09:55–10:04.

[49] *Id.* at 10:15–10:55.

Four minutes later, in response to questioning, Gray provided information to an officer about Poplasky's name and birthday.[50]

While Gray was being questioned about Poplasky, Detective Goddu conducted a canine sniff of the Nissan's exterior with a certified narcotics K9, which did not result in a primary alert during almost two passes of the vehicle.[51] After those canine sniffs, Detective Nott asked Detective Goddu about whether there was an alert for the grass next to the vehicle and Detective Goddu confirmed that a canine sniff was not conducted there.[52] Then, Detective Nott muted the microphone and had a discussion with his colleagues that lasted approximately two minutes.[53] At the conclusion of the discussion, Detective Nott directed Detective Goddu to conduct a canine sniff on Gray and stated that that he had not yet patted Gray down.[54]

Approximately twelve minutes after Gray exited his vehicle and stood next to the vehicle, Detective Nott patted down Gray.[55] An exterior sniff of Gray's person was then conducted, which resulted in a primary alert to the fanny pack on Gray's chest.[56] At this point, Gray was handcuffed while officers searched the fanny pack, which contained knotted baggies with a white rocklike substance, suspected by the officers to be crack cocaine and additional

---

[50] *Id.* at 14:22–14:50.

[51] Def. Ex. C. at 14:51–15:22 (canine sniff of the vehicle); ECF No. 107 at 85-89 (confirming that K9 canine was deployed for almost two passes which did not result in a primary alert).

[52] Def. Ex. C. at 15:30–15:52.

[53] Def. Ex. C. at 16:08–18:02 (discussion with no audio); ECF No. 107 at 196-197 (testimony confirming that a decision was made to conduct a canine sniff of Gray after the canine failed to alert to the exterior of the vehicle and that officers muted the video of that discussion).

[54] Def. Ex C. at 18:04–18:07 (informing Detective Goddu that "we will run it on him").

[55] *Compare* Def. Ex. C. at 06:10 (Gray exiting the vehicle) *with* 18:17 (Gray being patted down).

[56] Def. Ex. C. at 18:35–19:27.

contraband.[57] The entirety of the stop from the moment the car was pulled over to when Gray was detained (after Detective Nott informed Gray that the canine alerted the officers to the bag) took approximately nineteen minutes.[58]

### B.     Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "To 'safeguard Fourth Amendment rights generally,' . . . the Supreme Court has crafted the exclusionary rule, requiring the exclusion of evidence '[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights[.]'" *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (quoting *Herring v. United States*, 555 U.S. 135, 139–40 (2009) and *Davis v. United States*, 564 U.S. 229, 238 (2011)). Because the exclusion of evidence "exacts a heavy toll on the justice system, . . . the exclusionary rule does not apply whenever suppressing evidence 'might provide marginal deterrence.'" *United States v. Raymonda*, 780 F.3d 105, 117 (2d Cir. 2015) (quoting *Herring*, 555 U.S. at 141).

### C.     Discussion

Gray moves for an order suppressing any evidence seized from his person and from the trunk of the car he was driving on September 5, 2024, citing reasons that all go to his argument that the evidence was obtained in violation of the Fourth Amendment to the United States Constitution. First, Gray argues that officers measurably prolonged a routine traffic stop and that the officers lacked independent reasonable suspicion that he committed a drug-related

---

[57] ECF No. 107 at 156–157. *See* ECF No. 116 at 5–6.
[58] Def. Ex. C. at 19:24.

crime.[59] Second, Gray argues that officers conducted an illegal, warrantless search of his person by subjecting him to a drug-detection dog sniff without probable cause.[60]

"In determining whether a traffic stop has reasonably been extended into an investigatory seizure, we consider whether: (1) the officer's action was justified at its inception; and (2) the officer diligently pursued a means of investigation that was likely to confirm or dispel his or her suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Santillan*, 902 F.3d 49, 56–57 (2d Cir. 2018).

For the below reasons, while the Court finds that the traffic stop was justified at its inception, the Court agrees with Gray that officers measurably prolonged the traffic stop without reasonable suspicion in violation of the Fourth Amendment and that the good-faith exception is inapplicable, thus warranting suppression of the evidence.

### 1. There was Probable Cause to Stop the Nissan Driven by Gray

A "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Consequently, when evaluating the legality of an automobile stop, the Fourth Amendment imposes "a standard of reasonableness upon the exercise of discretion by . . . law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979) (cleaned up); *see also Whren*, 517 U.S. at 810 ("An automobile stop is thus subject to the constitutional imperative

---

[59] ECF No. 46-1 at 11–28.

[60] *Id.* at 29–36.

that it not be "unreasonable" under the circumstances."). "[A]n officer making a traffic stop [must] have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017) (cleaned up).

The Court finds that Detective Nott had probable cause to stop the Nissan. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. at 810. Detective Nott stopped the Nissan vehicle for failing to use a signal multiple times.[61] A driver's failure to give an "appropriate signal" when turning at an intersection is an "infraction" under Connecticut law. *See* Conn. Gen. Stat. §§ 14-242(a), (g); *United States v. Goins*, 157 F. Supp. 3d 148, 157 (D. Conn. 2016) ("Failing to signal a turn is a violation of Connecticut law."). Considering that an officer has authority to stop a vehicle for even minor traffic offenses, Detective Nott acted lawfully in stopping the Altima after he observed the failure to use a turn signal, as he "reasonably believe[d] that an offense has been … committed." *United States v. Scopo*, 19 F.3d 777, 781 (2d. Cir. 1994) (cleaned up).

### 2. Officers Unlawfully Prolonged the Stop of Gray's Vehicle in Violation of the Fourth Amendment

"Even if lawful at its inception, a traffic stop 'can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.'" *United States v. Wallace*, 937 F.3d 130, 137–38 (2d. Cir. 2019) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The landscape on whether a traffic stop's duration is unconstitutional is

---

[61] Tr., ECF No. 107 at 135–136.

exemplified by *Rodriguez v. United States*, where the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 575 U.S. 348, 350 (2015). The *Rodriguez* Court considered whether there was an unreasonable seizure when an officer pulled over a motorist and, after running a records check and issuing a written warning for a traffic infraction, the officer held the motorist to allow for a canine sniff of a vehicle. *Id.* at 351–52. In vacating a decision from the Eighth Circuit Court of Appeals finding *de minimis* a seven or eight-minute delay from the time the officer issued the written warning until the dog indicated the presence of drugs, the *Rodriguez* Court held that the traffic stop was unconstitutional because the officer had no reasonable suspicion after issuing the warning to conduct a canine sniff, which was an "unrelated inquiry" that "measurably extend[ed]" the duration of the stop. *Id.* at 355. While an officer "may conduct certain unrelated checks," that officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. Put another way, "authority for a traffic-stop seizure ends when the tasks tied to the traffic infraction are—or reasonably should have been—completed, unless the officer develops reasonable suspicion of criminal activity sufficient to extend the stop." *Santillan*, 902 F.3d at 56.

### a. Officers Prolonged the Seizure of Gray

The Court first finds that, in applying the principles articulated in *Rodriguez*, the officers measurably prolonged the traffic stop. Immediately prior to the canine sniff of Gray's person, the officers added time to the stop by having off-microphone conversations. As revealed in the body camera footage, Detective Nott called over Investigator O'Keefe, muted their microphones, conversed for about forty seconds, and then called over Officer Collins and

conversed for approximately one minute while again muting their microphones.[62] Prior to the off-microphone conversations, the officers possessed "all of the information needed" to complete the mission of the traffic stop, *Gomez*, 877 F.3d at 90, as they had already checked the vehicle registration, validated Gray's license, confirmed that Gray had no outstanding warrants, and conducted a canine sniff of the vehicle. Officers had therefore completed all traffic-related tasks prior to their off-microphone conversations but, nonetheless, did not write a ticket or summons. The officers' choice to spend several minutes on off-microphone discussions after completing all traffic-related tasks embodies the type of "bonus time to pursue an unrelated criminal investigation" that must be scrutinized under *Rodriguez*.

    **b.**  **There was no Reasonable Suspicion to Prolong the Stop or to Search Gray's Person.**

Next, the Court finds that the officers here lacked reasonable suspicion of a drug offense to extend the traffic stop once the officers completed the canine sniff of the vehicle.

The reasonable suspicion standard, which "requires more than an inarticulate hunch," requires "only facts sufficient to give rise to a reasonable suspicion that criminal activity *may* be afoot." *Santillan*, 902 F.3d at 56 (cleaned up). That "suspicion must derive from specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." *Id.* (cleaned up). In assessing reasonable suspicion, a "a reviewing court cannot merely defer to police officers' judgment" but rather "must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, whose insights are necessarily

---

[62] Def. Ex. C. at 16:08-18:02 (discussion with no audio).

guided by his experience and training." *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015) (cleaned up). The record must reveal more than an "inchoate and unparticularized suspicion" or a "conclusion derived from intuition in the absence of articulable, objective facts." *Id.* (cleaned up).

Here, the authority for the traffic-stop seizure of Gray ended after Detective Goddu finished the canine sniff of the vehicle. By that point, as discussed above, the officers had completed all traffic-related tasks related to Gray, including checking the vehicle registration, validating Gray's license, confirming that Gray had no outstanding warrants, and conducting a canine sniff of the vehicle. At that juncture, all tasks related to the traffic-stop seizure reasonably should have been completed unless an officer develops reasonable suspicion. *Santillan*, 902 F.3d at 56.

But the record indicates that, under the totality of the circumstances, the investigation conducted by the officers during the traffic stop provided no objective facts that Gray was engaging in criminal activity. Instead, the officers simply had an inarticulable hunch that Gray possessed drugs on his person. Gray was calm and provided clear information to law enforcement during the entirety of the traffic stop.[63] An officer opened the door to the vehicle to retrieve Gray's passenger's pants from the car,[64] but did not indicate that he found facts underlying reasonable suspicion from his observations inside of the vehicle. A canine sniff of

---

[63] ECF No. 116 at 5.
[64] Def. Ex. C at 10:15–10:55.

the Nissan's exterior did not result in any alerts to any narcotics during almost two passes of the vehicle.[65]

In making the determination that the officers lacked reasonable suspicion, the Court gives no weight to Detective Goddu's testimony that the canine sniff of the vehicle indicated a secondary alert, as the Court finds this portion of Goddu's testimony to be neither credible nor reliable. This portion of Detective Goddu's testimony is inconsistent with the record, including body cam footage showing Goddu relying on another officer's direction to search Gray's person, as opposed to Goddu communicating the facts underlying reasonable suspicion to another officer. The Court also gives little weight to any testimony from the Government's other witnesses regarding reasonable suspicion. The officers here concealed their conversations by muting their mics after they gathered all of the information needed to complete the mission of the traffic stop as to Gray.[66] The officers' seemingly strategic deactivation of their microphones here "depriv[ed] the court of the best and dispositive evidence in this case" related to reasonable suspicion. *United States v. Garcia*, 554 F. Supp. 3d 421, 432 (E.D.N.Y. 2021) (cleaned up). Thus, their testimony concerning this portion of the traffic stop and the development of reasonable suspicion during this period is afforded little weight.

As previously noted, a traffic stop violates the Fourth Amendment when "it is prolonged beyond the time reasonably required . . . to address the traffic violation that

---

[65] Def. Ex. C. at 14:51–15:22 (canine sniff of the vehicle); ECF No. 107 at 85-89 (confirming that K9 canine was deployed for almost two passes which did not result in a primary alert).

[66] Def. Ex. C. at 16:08–18:02 (discussion with no audio); ECF No. 107 at 196-197 (testimony confirming that a decision was made to conduct a canine sniff of Gray after the canine failed to alert to the exterior or the vehicle and that officers muted the video of that discussion).

warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 350, 354. In examining the amount of time reasonably required for a traffic stop's mission, a court must determine whether "the officer diligently pursued a means of investigation that was likely to confirm or dispel his or her suspicions quickly, during which time it was necessary to detain the defendant." *Santillan*, 902 F.3d at 57. Diligence was absent here. And the investigation conducted by the officers prior to the canine sniff of Gray's person dispelled any reasonable suspicion that Gray was engaging in criminal activity.

Accordingly, this Court concludes that Gray's traffic stop was unconstitutional because the officers unreasonably prolonged the stop by conducting a canine sniff of Gray's person when they lacked independent reasonable suspicion of a drug offense.

### 3. The Good Faith Exception is Inapplicable

Attempting to avoid suppression of evidence, the Government argues that Gray identifies no binding precedent that forecloses any of the steps that officers took during the traffic stop.[67] There would be little deterrent value in suppressing evidence, the Government argues, because the officers had a good faith belief that their actions were authorized under existing law.[68] But the Government overlooks substantial precedent in Gray's motion to suppress, including *Gomez* and *Rodriguez*.[69]

Importantly, as cited by Gray, the Second Circuit's consideration of the *Gomez* case illustrates the impact of *Rodriguez*. While surveilling addresses associated with a suspected leader of a heroin-trafficking organization, officers observed Gomez exit one of the addresses

---

[67] ECF No. 133 at 9–10.
[68] *Id.* at 10.
[69] ECF No. 46.

and then followed him to the second address, where he briefly entered and exited the residence, switched cars, and again drove away. *Gomez*, 877 F.3d at 81. The officers then followed Gomez to a hotel where they observed him exiting the hotel, placing a duffel bag in the vehicle's trunk, and driving away. *Id.* An officer pulled Gomez over after observing him commit several traffic violations, including driving through a red light, speeding, changing lanes without using a directional signal, and making a right turn at a red light without stopping. *Id.* at 82.

The *Gomez* court held that, following *Rodriguez*, the traffic stop of about five minutes violated the Fourth Amendment because the officer, without reasonable suspicion, "extended the seizure to ask questions pertinent to an unrelated criminal investigation." *Id.* at 91. The officer spent "much of the time of the stop, if not most of it, asking questions and executing searches related to the heroin investigation rather than conducting 'ordinary inquiries incident to the traffic stop'—such as checking Gomez's license, determining whether there were outstanding warrants for him, and inspecting the car's proof of insurance." *Id.* at 90. Though Gomez then consented to officers searching his car, where heroin was ultimately found, the Second Circuit concluded that the traffic stop violated the Fourth Amendment, recognizing that its previous jurisprudence "must yield to, *Rodriguez's* holding: unrelated inquiries that prolong or add time to a traffic stop violate the Fourth Amendment absent reasonable suspicion of a separate crime."

Consequently, the Court finds that the good-faith exception to the exclusionary rule does not apply. *Rodriguez* and *Gomez* make clear that prolonging a stop after completing the traffic stop's mission without reasonable suspicion, even if the resulting delay "was just a matter of minutes[,]" is unlawful. *United States v. Milton*, 621 F.Supp.3d 421, 431 (S.D.N.Y.

2022) (suppressing evidence where a traffic stop lasted approximately five or six minutes because the officers unreasonably prolonged the stop). Therefore, the officers here could not have conducted Gray's traffic stop in objectively reasonable reliance on any existing law. Suppressing evidence here is warranted, as it would provide much more than marginal deterrence of prolonging traffic stops in violation of the Fourth Amendment.

### D. Conclusion

For the foregoing reasons, Defendant's motion to suppress **granted**. Defendant's motion to supplement the record is **denied as moot**. Any evidence seized from Defendant's person and from the trunk of the car he was driving on September 5, 2024 is **suppressed**, as it was obtained in violation of the Fourth Amendment to the United States Constitution.

**SO ORDERED.**

Hartford, Connecticut
February 15, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge